**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STACY L. SMITH, et al., | ) | CASE NO. 1:24-CV-01637-JDA |
| | ) | |
| Plaintiffs, | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL ARMSTRONG |
| v. | ) | |
| | ) | |
| CHRISTINE A. ROSS, | ) | **OPINION AND ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I.   INTRODUCTION

Plaintiff Stacy L. Smith ("Ms. Smith"), along with several other plaintiffs, brought

suit against Defendant Christine A. Ross ("Ms. Ross") after she suffered injuries in a car

accident.[1] She alleges that Ms. Ross caused the accident while driving under the influence.

Ms. Smith has asserted a negligence claim against Ms. Ross, and she seeks to recover

damages for medical expenses, lost wages, and pain and suffering. The parties have consented

to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c). (ECF No. 19).

After Ms. Ross failed to appear or defend the action, the Court entered a default

judgment against her with respect to liability. (ECF No. 20). The Court subsequently held an

evidentiary hearing with respect to damages. After considering all the evidence and for the

reasons discussed below, the Court enters judgment in Ms. Smith's favor in the amount of

**$262,053.28** against Defendant Christine A. Ross.

---

[1] Plaintiffs also asserted claims against Defendant State Farm Automobile Insurance Company ("State Farm").
On January 30, 2026, State Farm filed a notice informing the Court that it had reached a settlement with all
plaintiffs. (ECF No. 22). On February 19, 2026, Plaintiffs and State Farm filed a joint stipulation of partial
dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii). (ECF No. 26). On March 3, 2026, the
Court dismissed Plaintiffs' claims against State Farm with prejudice. (ECF No. 27).

## II. PROCEDURAL HISTORY

On February 19, 2024, Ms. Smith and several other plaintiffs—Nakayla Pickett, Malena Pickett, Telisha Cole, and Nehgel Pickett (collectively, "Plaintiffs") filed their complaint against Ms. Ross and State Farm in the Cuyahoga County Court of Common Pleas. (ECF No. 1-1). On September 25, 2024, State Farm removed the case to this court pursuant to 28 U.S.C. § 1441. *Id.*

On July 7, 2025, Plaintiffs filed a motion for default judgment against Ms. Ross after she failed to answer or otherwise plead within the time allotted. (ECF No. 11). Ms. Ross did not respond to Plaintiffs' motion. On July 9, 2025, the Clerk of Courts entered a default against Ms. Ross pursuant to Federal Rule of Civil Procedure 55(a). (ECF No. 15).

Ms. Ross then failed to appear for a case management conference on October 30, 2025. (*See* ECF non-document entry dated October 30, 2025). On the same day, I granted Plaintiffs' motion for default judgment against Ms. Ross with respect to liability only, with damages to be determined at a later date. (ECF No. 20).

On April 2, 2026, Plaintiffs Nakalya Pickett, Malena Pickett, Telisha Cole, and Neghel Pickett voluntarily dismissed their claims against Ms. Ross without prejudice pursuant to Rule 41(a)(1)(A)(i).

On April 2, 2026, the Court held an evidentiary hearing on damages with respect to the default judgment it had previously entered in favor of Ms. Smith and against Ms. Ross. Ms. Smith testified, as did her husband, Nehgel Pickett. (ECF No. 30). Ms. Ross did not appear at the hearing, nor did anyone else appear on her behalf.

## III. FINDINGS OF FACT

A preponderance of the evidence admitted at the evidentiary hearing establishes the following facts:

On February 18, 2022, Ms. Smith was in Ypsilanti, Michigan, driving east on East Michigan Avenue when Ms. Ross crossed the center line and struck Ms. Smith's vehicle. Also in the vehicle were her two daughters, Nakayla Pickett and Malena Pickett, and her niece, Telisha Cole. Ms. Ross was charged and subsequently pled guilty to operating a vehicle while under the influence and resisting arrest.

An ambulance arrived on scene and transported Ms. Smith and the passengers to St. Joseph Mercy Hospital. In the ambulance, Ms. Smith was given pain medication, and her arm was placed in a temporary splint. At the hospital, Ms. Smith underwent X-rays, which showed closed fractures of the left radius and ulna. The next morning, an orthopedic specialist performed open reduction and internal fixation (ORIF) surgery, placing internal plates and screws in Ms. Smith's arm. Following surgery, Ms. Smith continued to receive pain medication and had her arm placed in a new splint. In addition to the broken arm, Ms. Smith suffered swelling and bruising on her leg, arm, and chest. The Rawlings Company, a subrogation company for Medical Mutual, paid $27,653.28 toward Ms. Smith's medical bills. Ms. Smith is required to repay that amount in its entirety.

After two nights in the hospital, Ms. Smith was discharged and returned home. The hospital prescribed her multiple medications, including oxycodone. The next day, Ms. Smith called her doctor, Dr. Joseph Orzechowski, and informed him that she was in a car accident and would need follow-up care. Dr. Orzechowski examined her and instructed her to take 30 days off work, with a reevaluation to follow. Ms. Smith took leave from work under the Family and Medical Leave Act of 1993. Ms. Smith also underwent seven sessions of physical therapy, which included lifting, rotation, and other basic movements to regain strength and mobility in her arm.

The accident impaired Ms. Smith's ability to perform basic tasks such as showering, washing her hair or hands, and doing the dishes. Ms. Smith was unable to cook for approximately two months, and it took several months for her to resume cleaning. She was unable to do laundry for almost nine months. The accident also prevented Ms. Smith from operating a vehicle for approximately 30 days. During this period, her husband assumed the responsibility of driving her. Ms. Smith and her husband were also forced to make arrangements with other families to assist in transportation for her children to sporting events and other activities.

The accident caused Ms. Smith significant pain, which she rated as a ten out of ten, for approximately a month. After that point, the pain decreased, but she continued to experience it to varying degrees, especially if she bumped her arm. As time progressed, the pain was tolerable as long as Ms. Smith took her pain medication.

At the time of the accident, Ms. Smith was a salaried employee with the Cuyahoga Metropolitan Housing Authority earning $54,000 per year. She returned to work approximately a month after the accident, but she was unable to perform heavy lifting or assist with event setup, tasks she had commonly performed before the accident. Her doctor wrote a note stating that she should not lift more than 10 pounds for a year. Ms. Smith is also required to do extensive typing at her job, and she has had difficulty doing so because of her injuries.

Ms. Smith continues to experience occasional pain with typing four years after the accident, and she uses an arm compression sleeve to mitigate swelling. Doctors have informed her that she may experience episodes of pain for the rest of her life because of the plates and screws in her arm.

Ms. Smith has keloid scars on her left arm as a result of the accident and surgery. She testified that the scarring has affected her mentally, describing it as a "constant reminder that [she] was in a really bad car accident" and as "sad to look at" and "a bit traumatizing." (ECF No. 30, PageID # 811). Ms. Smith wears long sleeves because she does not like looking at the scarring. Mr. Pickett, Ms. Smith's spouse, similarly testified that he witnessed the psychological effects the accident had on her. He said that she began dressing differently because her scars made her self-conscious, and that she continues to wear long sleeves, even four years later. The accident has also left Ms. Smith anxious about driving. While she is able to drive, she prefers for her husband to do so.

## IV.    CONCLUSIONS OF LAW

### A.  Legal Standards

"Following the clerk's entry of default pursuant to Rule 55(a) and the party's motion for default judgment under Rule 55(b), 'the complaint's factual allegations regarding liability are taken as true, while allegations regarding the amount of damages must be proven.'" *Logar v. Savelli*, No. 1:21-CV-00305, 2021 WL 2530213, at *1 (N.D. Ohio June 21, 2021) (quoting *P&G Health & Longterm Disability Plan v. Molinary*, No. 1:18-cv-283, 2019 WL 358936, at *1 (S.D. Ohio Jan. 29, 2019)). "Specifically, this Court is required to 'conduct an inquiry in order to ascertain the amount of damages with reasonable certainty.'" *Id*. (quoting *Osbeck v. Golfside Auto Sales, Inc*., No. 07-14004, 2010 WL 2572713, at *4 (E.D. Mich. June 23, 2010)).

The plaintiff bears the burden of establishing damages. *HICA Educ. Loan Corp. v. Jones*, No. 4:12 CV 962, 2012 WL 3579690, at *1 (N.D. Ohio Aug. 16, 2012). "The Court may determine damages either by holding an evidentiary hearing or may determine the amount of damages by affidavit and/or other documentary evidence." *Id*.

### B. Choice of Law

Before analyzing Ms. Smith's recoverable damages, the Court must determine which law applies. A federal court sitting in diversity applies the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). In tort actions, Ohio courts apply the "most significant relationship" test from Section 145 of the Restatement (Second) of Conflict of Laws (1971). *Morgan v. Biro Mfg.*, 15 Ohio St. 3d 339, 474 N.E.2d 286, 288-89 (1984).

Under Section 145 of the Second Restatement, "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6." Second Restatement, § 145(1). Section 145 sets forth four contacts that a court should consider in determining which state has the most significant relationship to the issue: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicil, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered." Second Restatement, § 145(2). These contacts "are to be evaluated according to their relative importance with respect to the particular issue." *Id.*

Section 146 of the Second Restatement further provides that "[i]n an action for personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which even the local law of the other state will be applied." Second Restatement § 146. Thus, under Ohio law, "a presumption is created that the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit."

*Morgan*, 474 N.E.2d at 289; *see also Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 874 (6th Cir. 2003) ("in Ohio, a party may overcome the presumption that the law of the place where the injury occurs will be applied to a tort action, if it can demonstrate that another state has a more significant relationship to the action").

Considering the Section 145 factors here, Michigan has the most significant relationship to the lawsuit. With respect to the first two factors, Michigan was the place of the accident and the place where the conduct causing the injury—Ms. Ross crashing into Ms. Smith's car while intoxicated—occurred. With respect to the fourth factor, "Ohio courts have found that in the context of a tort action, the place where the tortious conduct occurred is the place where the relationship, if any, between the parties [was] centered." *Grubb v. Day to Day Logistics, Inc.*, No. 2:14-CV-01587, 2015 WL 4068742, at *9 (S.D. Ohio July 2, 2015). The fourth factor thus likewise weighs in favor of Michigan law.

The remaining factor, the domicil and residence of the parties, does not overcome Michigan's interest in having Michigan law apply. It is true that Ms. Smith is an Ohio resident and domiciliary. However, State Farm is an Illinois corporation, while Ms. Ross is a Michigan resident and domiciliary. Ms. Smith's connections to Ohio are not sufficient to warrant application of Ohio law. *See Grubb*, 2015 WL 4068742, at *10 (S.D. Ohio July 2, 2015) ("as this case does not present the rare circumstances in which all parties and drivers are domiciled in Ohio, which is other than the state in which the accident occurred, this Court finds that Ohio does not have a 'more significant relationship' to the issues in this case than the state in which the automobile accident occurred, Virginia"); *Canal Ins. Co. v. Paul Bunyan, Inc.*, No. 3:20-cv-363, 2021 WL 462647, at *3 (S.D. Ohio Feb. 9, 2021) (applying Ohio law, the place

of the accident, rather than Michigan law, where one of the parties resided). The Court will therefore apply Michigan law in determining Ms. Smith's damages.

### C. Economic Damages

Ms. Smith first seeks to recover $32,053.28 in economic damages that she says she suffered as a result of the accident, consisting of medical expenses and lost wages. Michigan has enacted a no-fault automobile insurance statute, the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*. (the "No-Fault Act"). Under No-Fault Act, parties generally may not sue in tort for damages sustained in automobile accidents. *See* Mich. Comp. Laws § 500.3135(3). However, M.C.L. § 500.3135 codifies several exceptions to the general abolition of tort liability in automobile accident cases. Relevant here, tort liability is not abolished as to "[d]amages for economic loss by a nonresident" if the nonresident has "suffered death, serious impairment of body function, or permanent serious disfigurement." Mich. Comp. Laws § 500.3135(3)(d).

Ms. Smith has not suffered death. The question, then, is whether she has suffered serious impairment of body function or permanent serious disfigurement such that she may pursue a claim in tort for economic damages. M.C.L. § 500.3135(5) provides that a serious impairment of bodily function is one that (1) is objectively manifested; (2) impairs an important body function; and (3) affects the injured person's general ability to lead her normal life. Mich. Comp. Laws § 3135(5).

With respect to the first factor, a serious impairment is objectively manifested if it "is observable or perceivable from actual symptoms or conditions by someone other than the injured person." Mich. Comp. Laws § 500.3135(5)(a). The No-Fault Act draws a distinction between the injury itself and the impairment that the injury causes. "[W]hile an injury is the actual damage or wound, an impairment generally relates to the effect of that damage."

*McCormick v. Carrier*, 487 Mich. 180, 795 N.W.2d 517, 527 (2010). Thus, "the proper inquiry is whether the *impairment* is objectively manifested, not the *injury* or its symptoms." *Id*.

The Court has little difficulty concluding that Ms. Smith's impairment was objectively manifested. She suffered a broken arm, which medical records clearly link to the accident. An observer other than Ms. Smith would perceive both that Ms. Smith's arm was broken and that the broken arm caused her a perceivable impairment, requiring surgery and limiting her ability to engage in variety of activities. *See McCormick*, 795 N.W.2d at 539 (holding that effects of broken ankle, including problems walking, crouching, climbing, and lifting, constituted objectively manifested impairment).

Ms. Smith also satisfies the second factor because the accident impaired an important body function, which the No-Fault act defines as "a body function of great value, significance, or consequence to the injured person." Mich. Comp. Laws § 500.3135(5)(b). The use of one's arm is a function of great value, significance, or consequence, and Ms. Smith and her husband testified that the injury impaired her ability to work, drive, and perform household chores. *See McCormick*, 795 N.W.2d at 539; *Denzer v. United States*, No. 22-10868, 2024 WL 1142368, at *6 (E.D. Mich. Mar. 15, 2024) (holding that torn rotator cuff impacted important bodily function).

With respect to the third factor, an impairment affects the injured person's ability to live a normal life if it "had an influence on some of the person's capacity to live in his or her normal manner of living." Mich. Comp. Laws § 500.3135(5)(c). The inquiry is "inherently fact and circumstance specific to each injured person, must be conducted on a case-by-case basis, and requires comparison of the injured person's life before and after the incident." *Id*.

The Michigan Supreme Court has held that the No-Fault Act "merely requires that a person's general ability to lead his or her normal life has been *affected*, not destroyed." *McCormick*, 795 N.W.2d at 530. "Thus, courts should consider not only whether the impairment has led the person to completely cease a pre-incident activity or lifestyle element, but also whether, although a person is able to lead his or her pre-incident normal life, the person's general ability to do so was nonetheless affected." *Id*. "[T]here is no quantitative minimum as to the percentage of a person's normal manner of living that must be affected." *Id*.

Here, Ms. Smith has shown that the impairment affected her general ability to live her normal life. Ms. Smith required surgery to repair her broken arm and had to take a month off of work pursuant to her doctor's orders. During her recovery, the injury impaired her ability to shower, wash her hair or hands, and perform household chores. Ms. Smith testified that she could not cook for two months, did not resume cleaning for several months, and could not do the laundry for almost nine months. Ms. Smith also could not drive for a month, which meant that her husband had to take their children to sporting events and other activities. Even after she returned to work, her impairment impacted her ability to do her job, including her ability to type. Ms. Smith continues to experience occasional pain with typing and uses an arm compression sleeve to mitigate swelling.

Considering the specific facts and circumstances regarding Ms. Smith's impairment and pre-injury activities, the Court concludes that the impairment impacted her general ability to live her normal life. *See McCormick*, 795 N.W.2d at 539 (holding that broken ankle impaired plaintiff's ability to lead normal life because it required two surgeries and caused him to miss work for over a year); *Denzer*, 2024 WL 1142368, at *6 (holding that torn rotator

cuff affected plaintiff's general ability to live normal life during surgery and recovery period because it impacted her ability to shower and dress); *Stevenson v. Neubar*, No. 351886, 2021 WL 840752, at *3 (Mich. Ct. App. Mar. 4, 2021) (unpub.) (holding that plaintiff created triable question regarding whether broken wrist affected normal life where plaintiff missed five weeks of class due to inability to type and use a computer, was unable to fully perform work duties for weeks, and could not participate in chores, hobbies, or childcare).

It is true that Ms. Smith has largely recovered from her injuries. However, "[a]lthough temporal considerations may be relevant, there is no temporal requirement for how long an impairment must last." Mich. Comp. Laws § 3135(5)(c); *see also Piccione as Next Friend of Piccione v. Gillette*, 327 Mich. App. 16, 932 N.W.2d 197, 202 (2019) ("the fact that the impairment to [plaintiff's] important body function only lasted three or four months has no bearing on the question at hand"); *Denzer*, 2024 WL 1142368, at *6 (holding that plaintiff's likely recovery from torn rotator cuff "does not foreclose a finding that she suffered a serious impairment during her recovery period"); *David v. Hall*, No. 367950, 2024 WL 3841716, at *4 (Mich. Ct. App. Aug. 15, 2024) (unpub.) ("the fact that the decedent was able to make a recovery within two months of the accident is not dispositive"). Accordingly, Ms. Smith suffered a serious impairment of bodily function, and she may pursue a claim in tort for economic damages under M.C.L. § 500.3135(3)(d).[2]

Ms. Smith seeks economic damages for medical expenses and lost wages totaling $32,053.28. The evidence she submitted is sufficient to establish those damages to a reasonable certainty. With respect to medical expenses, Ms. Smith submitted medical records, which include the medical providers, dates of service, and expenses incurred for treatment.

---

[2] Because the Court concludes that Ms. Smith has demonstrated serious impairment of bodily function, it is unnecessary to consider whether her keloid scars constitute permanent serious disfigurement.

(ECF No. 12-3). Those records establish that Ms. Smith was admitted to St. Joseph Mercy Ann Arbor on February 18, 2022, underwent surgery on February 19, 2022, and was released on February 20, 2022. Upon returning home, she began physical therapy, completed seven sessions, and met with her doctor, Dr. Orzechowski, multiple times, including on February 21, 2022, and April 8, 2022. Ms. Smith has also established by a preponderance of the evidence that she is responsible for $27,653.28 to the Rawlings Group for that care. Ms. Smith is thus entitled to recover $27,653.28 from Ms. Ross for medical expenses proximately caused by Ms. Ross' negligence.

Ms. Smith also took unpaid FMLA leave from February 22, 2022, through March 21, 2022, and intermittent leave from March 22, 2022 through February 21, 2023 (ECF No. 12-1, PageID #323-324). During her FMLA leave, Ms. Smith used 148.5 sick hours, 20 vacation hours, and 1 personal hour. (ECF No. 12-4). Prior to the accident, Ms. Smith's salary was $54,000 per year, or $25.96 per hour at 40 hours per week. (ECF No. 12-4, PageID# 425). Because Ms. Smith missed a total of 169.5 hours at $25.96 per hour, her lost wages amount to $4,400.

In light of the evidence submitted, the Court finds that Ms. Smith's economic damages in this case for medical expenses and lost wages proximately caused by Ms. Ross' negligence total **$32,053.28**.

### D. Noneconomic Damages

Ms. Smith also seeks noneconomic damages for pain and suffering. M.C.L. § 500.3135(1) provides that, notwithstanding Michigan's No-Fault Act, an injured party may recover noneconomic losses caused by another's use of a motor vehicle if the injured party has "suffered death, serious impairment of body function, or permanent serious disfigurement." Mich. Comp. Laws § 500.3135(1). For the reasons discussed above, Ms.

Smith suffered serious impairment of body function when she broke her arm in the accident, and Michigan's No-Fault Act does not preclude her from seeking to recover noneconomic damages.

Ms. Smith has established that the accident caused her pain and suffering. Ms. Smith suffered a broken arm, which required immediate surgery and physical therapy, and which placed significant limitations on her ability to work, perform household chores, and drive during the recovery process. Ms. Smith testified credibly to the intense pain that the injury caused her during the recovery process. She also testified that she continues to experience some pain and may have pain for the rest of her life. Ms. Smith also testified that the pain impairs her ability to type for long periods, which is necessary for her employment.

In addition, Ms. Smith and her husband testified to the mental and emotional toll that the accident has taken on her. Ms. Smith testified that she had significant anxiety about driving immediately after the accident and that she continues to experience anxiety and prefers for her husband to drive. Ms. Smith also has keloid scars on her arm. She and her husband both testified that the scarring is traumatizing and that she tends to wear long sleeves to avoid looking at it.

Based on the testimony of Ms. Smith and her husband, as well as the Court's review of all the evidence, the Court finds that Ms. Smith has proven to a reasonable certainty that she suffered damages for pain and suffering in the amount of **$230,000**.

## V.    CONCLUSION

For the reasons set forth above, the Court enters judgment in favor of Plaintiff Stacy L. Smith and against Defendant Christine A. Ross in the amount of **$262,053.28**, consisting of **$32,053.28** for medical expenses and lost wages and **$230,000** for pain and suffering. A final judgment entry will be entered separately.

**IT IS SO ORDERED.**

Dated:  August 6, 2026

*/s Jennifer Dowdell Armstrong*
JENNIFER DOWDELL ARMSTRONG
UNITED STATES MAGISTRATE JUDGE